IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA, MIAMI

Case No. 08-CV-22131-USDJ Graham/USMJ Torres

DENEE VANDYKE and BEN WALKER,       )
individually and on behalf of a class of    )
similarly situated individuals,              )
                                             )
                         Plaintiffs,         )
                                             )
            v.                               )
                                             )
MEDIA BREAKAWAY LLC, a Nevada limited )
liability company,                           )
                                             )
                         Defendant.          )

**PLAINTIFFS' COMBINED MOTION AND MEMORANDUM IN SUPPORT OF
FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PETITION FOR
APPROVAL OF ATTORNEYS' FEES AND PLAINTIFFS' INCENTIVE AWARD**

Plaintiffs Denee VanDyke and Ben Walker, by and through Class Counsel, pursuant to

Federal Rule of Civil Procedure 23, respectfully move the Court for entry of an Order (1)

granting final approval of the Stipulation of Class Action Settlement between Plaintiffs and

Defendant Media Breakaway, LLC ("Media Breakaway" or "Defendant"), (2) dismissing the

Second Amended Complaint against Media Breakaway with prejudice and releasing Media

Breakaway of any and all liability as provided in the Stipulation of Settlement, (3) awarding

Class Counsel reasonable attorneys' fees and expenses, and (4) awarding an incentive payment

to Class Representative Ben Walker and named-plaintiffs Denee VanDyke and Ronald Ayers. In

support, Plaintiffs submit the incorporated memorandum of law, stating as follows:

## I.     INTRODUCTION

In this class action, Plaintiffs Ben Walker and Denee VanDyke seek redress from Media

Breakaway for its alleged involvement in the practice known in the cellular telephone industry as

"cramming." "Cramming" refers to charges for so-called "mobile content" (i.e., customized ringtones, sports score reports, daily horoscopes, text message alerts, etc.) being placed on the cell phone bills of consumers without their authorization. On June 15, 2009, the Court granted preliminary approval of the Stipulation of Settlement (the "Settlement Agreement"), which preliminarily resolves all claims asserted against Media Breakaway in this and one other related, but previously dismissed, class action lawsuit in California state court.[1] As approved by the Court, notice to hundreds of thousands of Class Members—in the form of direct e-mail notice, Internet website notice, and publication notice in dozens of national newspapers and periodicals—is now complete and the comprehensive notice plan has been very successful, generating thousands of visits to the settlement website, which has resulted in substantial refunds to the Class.

The reaction of the Class has been overwhelmingly favorable. The September 1, 2009 deadline for the submission of exclusions and objections has passed and not a single person sought to object to, or be excluded from, the settlement. As importantly, all relevant state and federal agencies received notice of the Settlement Agreement pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1715, and not a single state or federal agency voiced any opposition to the terms of the Settlement Agreement. This is no surprise since the settlement provides Class Members up to $7.6 million of cash relief (roughly equating to the full damages allegedly owed to the Class), as well as strong injunctive relief aimed at putting an end to the phenomenon of billing for unauthorized mobile content. Indeed, the settlement terms approach the best the Plaintiffs could have hoped to achieve at trial and given the hurdles facing them in this litigation, the results achieved are more than fair, adequate, and reasonable.

---

[1] The related class action involved in this settlement was captioned *Ronald Ayers v. Media Breakaway, LLC*, No. BC 397096 (Los Angeles County, CA) (hereinafter referred to as "the Related Action").

Given the strength of the settlement and the support behind it, Plaintiffs respectfully ask that the Court grant final approval. Plaintiffs further ask that the Court grant their request for attorneys' fees in the amount of $1,520,000.00 (representing 20% of the cash value of the settlement), and costs in the amount of $34,034.07, each awarded by a neutral arbitrator. Finally, Plaintiffs ask that the Court grant their request for an incentive payment to the Class Representative and named-plaintiffs in the collective amount of $6,000.

## II.   NATURE OF THE LITIGATION

### 1.   The Allegations of the Class Action Complaint

While this settlement brings considerable relief to a defined set of wireless consumers charged for mobile content associated with Media Breakaway, it represents only a fraction of the dozens of class actions that have been filed throughout the country by consumers challenging "cramming" practices taking place in the mobile content industry. This is the second settlement of its kind (i.e. involving cramming) reached by Class Counsel in the Southern District of Florida. (Declaration of Jay Edelson, ¶ 22, a true and accurate copy of which is attached as Exhibit A.) The first such settlement, in the case captioned *Gray v. Mobile Messenger Americas, Inc.*, No. 08-cv-61089 (S.D. Fla. Dec. 1, 2008), received final approval on December 1, 2008 by District Judge Cecilia M. Altonaga. (*Id.*) At the time, the *Gray* settlement was the first and only cramming settlement with a billing aggregator. (*Id.*) In addition to the *Gray* settlement, Class Counsel have also reached the nation's first and only cramming settlement with a wireless carrier in the case of *McFerren v. AT&T Mobility, LLC*, No. 2008-CV-151322, (Fulton County, Georgia). (*Id.*) Thus, the settlement structure established here is largely based upon the settlements reached in *Gray* and *McFerren*. (*Id.*)

3

The operative pleading in this action is Plaintiffs' Second Amended Class Action Complaint, which alleges causes of action for (1) Restitution/Unjust Enrichment, and (2) Tortious Interference with a Contract. (Dkt. No. 38.) The facts alleged in this case are similar to the facts alleged in the Related Action and therefore, this proposed settlement would cover the claims previously asserted in the Related Action. (Edelson ¶ 10.)

As alleged in this case, though disputed by Media Breakaway, "cramming" is the result of systematic flaws present in Media Breakaway's billing system and that of its industry partners, which arose due to the largely unplanned growth of the mobile content industry. (Dkt. No. 1, Ex. A ¶¶ 6-9.) This allegedly flawed system was developed to account for the exponential demand of consumers for mobile content. (*Id.* at ¶¶ 10-11.) Prior to these class actions, those in the mobile content industry, including Media Breakaway, had virtually no incentive to correct the flaws leading to these unauthorized charges. (*Id.* at ¶¶ 17-21.) As demonstrated by these settlements, however, this lawsuit, as well as many others, not only provide redress to the Plaintiffs, but also offer mobile content providers and their industry partners, an incentive to ensure that consumers are no longer charged for products and services they neither wanted nor authorized.

### 2.    Investigation, Litigation, & Settlement.

In 2005, Class Counsel began a wide-ranging investigation into the premium mobile content industry. (Edelson Decl. ¶ 2.) To date, that investigation has resulted in information gathered from over 10,000 aggrieved consumers and consultation with retained experts regarding the structure of the mobile content industry, its inherent flaws, and its rapid growth. (*Id.* at ¶ 3.) It has also led to an exchange of information and litigation strategy with multiple governmental agencies, including the Office of the Florida Attorney General and the California Public Utilities

Commission ("CPUC"). (*Id.* at ¶ 4.) With respect to the Office of the Florida Attorney General, Class Counsel had in-person meetings to discuss their respective investigations into unauthorized charges in the mobile content industry generally, and those allegedly imposed by Media Breakaway specifically. (*Id.* at ¶ 5.) Class Counsel have also received and reviewed numerous documents produced from the Illinois, Maryland, and Florida Attorney Generals' Offices. (*Id.* at ¶ 4.) Such investigation and cooperation resulted in the initiation of litigation against Media Breakaway, as well as others in the Mobile Content industry. (*Id.* at ¶ 5.)

This litigation was hard fought from the outset. Plaintiff VanDyke originally filed suit against Media Breakaway in the Circuit Court for the Eleventh Judicial Circuit, Dade County, Florida. (Dkt. No. 1.) Thereafter, Media Breakaway removed the case to this Court under the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.) (Dkt. No. 1.) Once Media Breakaway removed the case to federal court, it proceeded to attack the legal sufficiency of the Complaint. (Dkt. No. 9.) VanDyke then filed an Amended Complaint (Dkt. No. 11), but Media Breakaway once again moved for dismissal. (Dkt. No. 18.) Ultimately, the Court granted in part, and denied in part, Media Breakaway's motion to dismiss. (Dkt. No. 28.) VanDyke eventually sought leave to file a Second Amended Complaint (Dkt. No. 30) adding, among other things, an additional Plaintiff (Ben Walker). On December 9, 2008, over Media Breakaway's objection (Dkt. No. 34), the Court granted Plaintiffs leave to file a Second Amended Complaint. (Dkt. No. 37.)

Discovery was especially contentious and required court intervention. (Declaration of Rafey S. Balabanian ¶ 3, a true and accurate copy of which is attached hereto as Exhibit B.) Because the Court set January 5, 2009 as the deadline for Plaintiffs to file their motion for class certification, Plaintiffs sought to conduct discovery in an expeditious manner. (Balabanian Decl.

¶ 3.) Plaintiffs propounded written discovery, including interrogatories and requests for documents, which Media Breakaway answered, along with a voluminous document production. (*Id.*) Plaintiffs also sought to take the depositions of Media Breakaway's key employees, including its founder and CEO. (*Id.*) Although Media Breakaway attempted to block the depositions (Dkt. Nos. 40 and 46), after a special hearing at which Plaintiffs sought to compel such depositions, Magistrate Judge Torres compelled Media Breakaway to produce its CEO for deposition. (Dkt. No. 48.)

Shortly before the depositions were set to proceed, on January 12, 2009, the Parties reached a settlement in principal by way of a memorandum of understanding ("MOU"). (Balabanian Decl. at ¶ 4). As set forth in the MOU, the parties reached an agreement in principal as to all relief due the Class and the only issues that remained outstanding were the amount of attorneys' fees to be paid to Class Counsel and incentive awards to be paid to the Class Representatives. (*Id.*) Under the MOU, the parties agreed to refer such disputes to mediation or binding arbitration presided over by Rodney A. Max of the Upchurch Watson White & Max Mediation Group (the "Mediator" or the "Arbitrator"). (*Id.*) One month later, on February 13, 2009, the Parties executed formal settlement papers and presented the settlement to the Court for preliminary approval (Dkt. No. 56), which the Court granted on June 15, 2009. (Dkt. No. 79.) At the time of filing, the only issue that remained outstanding under the Settlement Agreement was the amount of attorneys' fees to be paid to Class Counsel, which again, the Parties agreed to mediate or arbitrate, if necessary. (*See* Dkt. No. 56-1, Stipulation of Settlement, p. 26, § XIII.)

Plaintiffs then commenced confirmatory discovery in the form of interrogatories and requests for documents. (Balabanian Decl. ¶ 6.) Plaintiffs also deposed Media Breakaway's Director of Product Development on two separate occasions. (*Id.* at ¶ 6.) On April 8, 2009,

6

Media Breakaway responded to Plaintiffs' first set of confirmatory interrogatories and requests for documents, and granted Class Counsel in-camera access to their computerized billing system, which Media Breakaway considers confidential and proprietary in nature. (*Id.* at ¶ 7.) Confirmatory discovery revealed that Media Breakaway's revenues exceeded the amount that originally formed the basis for the $5.75 million Settlement Cap. (*Id.*) The increased revenues prompted Class Counsel to seek additional monetary relief on behalf of the Class consistent with the percentage that formed the basis for the original Settlement Cap amount. (*Id.* at ¶ 8.) Eventually, the Parties agreed, with the assistance of the Mediator, to increase the amount of the Settlement Cap from $5.75 to $7.6 million. (*Id.*); (Dkt. No. 74.)

With Class relief firmly in place, on June 3, 2009, the Parties met with the Mediator in an attempt to reach agreement on the issue of attorneys' fees. (Balabanian Decl. ¶ 9.) While the Parties attempted in good faith to reach agreement on that issue, the mediation was not successful. (*Id.* at ¶ 9.) As a result, the Parties referred the issue of attorneys' fees to binding arbitration (subject to Court approval) as provided in the Settlement Agreement. (*Id.* at ¶ 10.) The arbitration took place on July 8, 2009, followed by extensive briefing by both Parties. (*Id.* at ¶ 11.) Following oral argument and briefing, on August 3, 2009, the Arbitrator awarded Class Counsel, subject to this Court's final approval, $1,593,935.40 in total attorneys' fees and $34,034.07 in reimbursable costs and expenses pursuant to the Section XIII of the Settlement Agreement. (*Id.* at ¶ 12.); (Dkt. No. 82.) On August 24, 2009, Media Breakaway moved the Arbitrator to Reconsider the Award. (Balabanian Decl. ¶ 12.); (Dkt. No. 85-1.) Not persuaded by Media Breakaway's arguments, on September 4, 2009, the Arbitrator affirmed the method for determining, and the percentage of, the Fee Award. (Balabanian Decl. ¶ 13.); (Dkt. No. 95.) However, accounting for the lodestar cross-check as required by federal law, the Arbitrator

reduced the award by $73,935.40. (Dkt. No. 95, p. 2.)  Thus, after careful consideration, the

Arbitrator awarded Class Counsel $1,520,000.00 in total attorneys' fees and $34,034.07 in costs.

(Dkt. No. 95.) Such Award, however, remains subject to the approval of the Court.

### III.    TERMS OF THE SETTLEMENT

The key terms of the Settlement Agreement for which final approval is sought are as

follows:

1.    **Class Definition.**  The settlement class is certified as:

> All current and former Wireless Subscribers in the United States
> and its territories who, at any time from the date Media Breakaway
> engaged in the Mobile Content business until the date notice is
> disseminated to the Settlement Class, were billed and who paid for
> Mobile Content associated with Media Breakaway which was
> claimed to not be authorized through any unlimited number of
> means, including but not limited to claims of deceptive advertising
> or technology issues. Excluded from the Settlement Class are: (a)
> Media Breakaway; (b) any current or former employee, officer, or
> agent of Media Breakaway; (c) class members who have (i)
> released their claims through other settlements, or (ii) received
> partial or full reimbursements for Mobile Content charges from
> any source; (d) the Claims Administrator, and its respective
> parents, subsidiaries, successors, predecessors, and related entities;
> and (e) any trial judge(s) presiding over this Action, the Related
> Actions, and the immediate family members of any such trial
> judge(s).

(Dkt. No. 56-2, p. 10, § II "Definitions".)

2.    **Individual Class Member Benefits.**  Media Breakaway has agreed to provide

$10.00 cash refunds to Class members who submit valid claim forms by the claims deadline of

December 15, 2009. Class member claims will be paid from the $7.6 million made available to

the Class, subject to the Court's final approval of the Settlement Agreement and the Effective

Date of the Settlement Agreement.  Should the total amount of claims, notice and administrative

expenses, attorneys' fees and incentive awards exhaust the $7.6 million Settlement Cap, Class

members will receive a refund of the lesser of $10.00 or the *pro rata* amount of the Settlement Cap. (*Id.* at p. 14, § V(B)(1).)

3.      **Group Relief and Additional Relief.**   In addition to the individual monetary relief to the settlement class outlined above, Media Breakaway has also agreed to provide the following group and other relief for the benefit of the class:

A.      **Media Breakaway Service Improvements and Assurances:**   Media Breakaway has agreed to continue any beneficial consumer protection policies presently in place and to continue and enhance its refund policy and to allow all wireless subscribers to cancel any unwanted mobile content subscription through contacting its customer service department. This requires Media Breakaway to inform all wireless subscribers who contact Media Breakaway regarding claimed unauthorized charges of their option to unsubscribe from mobile content upon request. (*Id.* at p. 14-15, § V(A)(1)(2).)

Media Breakaway has further agreed to continue to adhere to U.S. federal laws and rules and applicable state regulations concerning the advertising and sale of mobile content subscription services, as well as applicable prevailing mobile best practices, such as the Consumer Best Practices Guidelines promulgated by the Mobile Marketing Association ("MMA"), in effect as of the Effective Date of this Settlement Agreement and as amended from time to time, as well as any other applicable state or regulatory promulgations. (See MMA's Consumer      Best      Practices      Guidelines,      Version      4.0,      available      at www.mmaglobal.com/bestpractices.pdf, last updated July 1, 2009).

B.      **Payment of Notice and Administrative Fees:**   Media Breakaway has retained Rosenthal and Company as the Claims Administrator and has paid for the cost of sending the Court-approved notice, as well as all costs of administration incurred to date, and to

9

be incurred through the claims deadline.  Under the Settlement Agreement, all notice and administrative costs are to be deducted from the $7.6 million made available to the Class. (Dkt. No. 56-2, p. 9-10, § II "Definitions".)

      **C.**    **Compensation to the Class Representatives**:  In recognition of their efforts on behalf of the Class, Media Breakaway has agreed to pay Class Representative Ben Walker and named-plaintiffs Denee VanDyke and Ronald Ayers a collective incentive payment of $6,000 for their efforts in this and the Related Action.  (*Id.* at p. 27, § XIII(C).)

      **D.**    **Payment of Attorneys Fees**:  Pursuant to Section XIII of the Settlement Agreement, the Arbitrator has awarded Class Counsel, subject to Court approval, $1,520,000.00 in attorneys' fees and $34,034.07 for reimbursable costs and expenses.  Media Breakaway has agreed not to object to, or otherwise challenge the Arbitrator's Award and Class Counsel have agreed not to seek more than said amount. (*Id.* at p. 26, § XIII(A).)

    **4.**    **Release.**  If this Court grants final approval of the settlement, Media Breakaway and its industry partners (i.e., the wireless carriers, aggregators, mobile content providers, and affiliate marketers) will receive a release from the Class limited to all claims for unauthorized mobile content associated with Media Breakaway. (*Id.* at p. 25, § XII.)

    As shown below, the terms of relief warrant final approval.

## IV.    THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL

    Under Federal Rule of Civil Procedure 23(e), "[t]he court must approve any settlement, voluntary dismissal, or compromise of the claims, issues or defenses of a certified class" and such approval may occur "only after a hearing and on finding that the settlement, voluntary dismissal, or compromise is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e).  There is "an overriding public interest in favor of settlement, particularly in class actions that have the well-

deserved reputation as being the most complex." *Access Now, Inc v. Claires Stores, Inc.*, Case No. 00-14017-CIV, 2002 WL 1162422 at *4 (S.D. Fla. May 7, 2002); *see also Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)[2] (finding that "[p]articularly in class action suits, there is an overriding public interest in favor of settlement."). A class action settlement should be approved so long as it is "fair, adequate and reasonable and it is not the product of collusion between the parties." *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984); *Cotton*, 559 F.2d at 1330. When conducting its review, the court "should always review the proposed settlement in light of the strong judicial policy that favors settlements." *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1329 (S.D. Fla. 2001).

Whether a settlement is "fair, adequate, and reasonable," is determined by the court's consideration of the following six factors:

> (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved.

*Bennett*, 737 F.2d. at 986; *see also Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1314-15 (S.D. Fla. 2005). In its consideration of these factors, the Court "should be hesitant to substitute . . . [its] own judgment for that of counsel." *In re Smith*, 926 F.2d 1027, 1028 (11th Cir. 1991); *Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292, 1320 (S.D. Fla. 2007). In other words, "the [Court] must guard against the temptation to become an advocate—either in favor of the settlement because of a desire to conclude the litigation, or against the settlement because of the responsibility to protect the rights of those not parties to the settlement." *In re Smith*, 926 F.2d at

---

[2] All decisions of the Fifth Circuit Court of Appeals decided prior to close of business on September 30, 1981 have been adopted as binding precedent in this Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).

1028; *Figueroa*, 517 F. Supp. 2d at 1320 (both cases quoting Manual for Complex Litigation (2d) § 23.14 at 160 (1986)).

Thus, in order to answer the question of whether to grant final approval, the court must ultimately engage in a two-prong analysis: (1) whether the settlement was the result of arms-length bargaining or the product of collusion between the parties; and (2) whether the application of the *Bennett* factors show the settlement to be fair, adequate, and reasonable. *See Lipuma*, 406 F. Supp. 2d at 1315.

### 1.  The Settlement Agreement is Procedurally Fair and is the Product of Informed Arms-Length Negotiations

In assessing the procedural fairness of a class action settlement, "the Court must determine if the settlement 'was achieved through arms-length negotiations by counsel with the experience and ability to effectively represent the class's interests.'" *Figueroa*, 517 F. Supp. 2d at 1321 (quoting *Becher v. Long Island Lighting Co.*, 64 F. Supp. 2d 174, 178 (E.D.N.Y. 1999)); *see also Knight v. Alabama*, 469 F. Supp. 2d 1016, 1031 (N.D. Ala. 2006) (finding that the court must address whether settlement was product of collusion).

In this case, there should be no doubt that the settlement is the result of arms-length negotiations and not the product of collusion between the Parties.  Settlement discussions began in December 2008, and continued until the Parties executed formal settlement papers on February 13, 2009. (Edelson Decl. ¶¶ 6-10.)  The fact that the Parties refused to discuss the issue of attorneys' fees to be paid to Class Counsel is indicia that settlement discussions were conducted at arms-length.  Indeed, it was not until September 4, 2009—approximately 8 months after the Parties reached agreement on Class relief—that the Parties resolved, through arbitration, the amount of attorneys' fees to be paid to Class Counsel.  (Balabanian Decl. ¶¶ 11-13.)  Of significance, in its Order granting preliminary approval of the settlement, the Court specifically

12

found that there was no collusion between the Parties in reaching the Settlement Agreement. (Dkt. No. 79, p. 9.)

Class Counsel brought their knowledge and expertise to these settlement discussions developed through their in-depth investigation into the mobile content industry, their analysis of thousands of complaints from aggrieved customers (hundreds of whom claimed they incurred unauthorized charges associated with Media Breakaway), and their analysis of the information collected through discovery. (Edelson Decl. ¶ 7.) Also of note is the fact that Class Counsel are respected members of the legal community, have regularly engaged in major complex litigation, and have had extensive experience in consumer class action lawsuits involving cellular telephony that are similar in size, scope and complexity to the present case.  (*Id.* at ¶ 22.)  In fact, Class Counsel have secured settlements in several nationwide class actions involving unauthorized cell phone charges, including the recent final approval in this District of the first class action settlement involving "cramming" allegations against a billing aggregator.  (*Id.*)

The numerous pending class actions against Media Breakaway, the wireless service providers, aggregators, and other content providers have allowed Class Counsel to conduct extensive investigations into the relevant facts and law and to test certain issues through motion practice and discovery.  In the end, the Settlement Agreement was reached by experienced counsel who had more than enough information to evaluate, and effectively represent, the interests of the Class. *See Lipuma*, 406 F. Supp. 2d at 1316-1317 (citing *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155 (4th Cir. 1991) (finding that plaintiff's counsel were adequately informed of the strength of the claims as a result of evidence obtained through informal discovery)).  Thus, as there was no collusion between experienced counsel in reaching the Settlement Agreement, the settlement is procedurally fair and the product of informed arms-length negotiations.

2. **The Settlement Agreement is Substantively Fair, Adequate, and Reasonable Under the *Bennett* Factors.**

A. **The Likelihood of Success at Trial.**

Under *Bennett*, the first factor the Court must consider is Plaintiffs' likelihood of success at trial. 737 F.2d at 986. "The likelihood of success on the merits is weighed against the amount and form of relief contained in the settlement." *Lipuma*, 406 F. Supp. 2d at 1319. Thus, the first *Bennett* factor, which courts have found to be the most important, requires that the strength of a plaintiff's case on the merits be weighed against the value of the settlement. *See Figueroa*, 517 F. Supp. 2d at 1323-24.

Class Counsel believe that Plaintiffs' claims in this matter—and the Related Action encompassed by the Settlement Agreement—are strong and that ultimately Plaintiffs would prevail on the merits at trial. (Edelson Decl. ¶ 23.) The linchpin of Plaintiffs' claims is that systematic flaws in Media Breakaway's billing system arose due to the rapid and largely unplanned growth of the mobile content industry, which has resulted in charges for mobile content being included on consumers' cell phone bills without authorization. (Dkt. No. 1, Ex. A ¶¶ 6-9.) It is important to note, however, that although the legal theories upon which Plaintiffs base their claims may appear simplistic, the evidence and expert opinions required to substantiate those claims and the resultant damages would be highly complex. (Edelson Decl. ¶ 25.)

Plaintiffs' Second Amended Complaint asserts claims on behalf of a nationwide class of cell phone subscribers alleging Restitution/Unjust Enrichment and Tortious Interference with a Contract. (Dkt. No. 1, Ex. A.) To prevail on these claims, Plaintiffs would have to show that Media Breakaway knew of the flaws in its systems that resulted in the unauthorized charges at issue and yet despite that knowledge, repeatedly assessed mobile content charges on the cell phone bills of consumers without authorization. However, Media Breakaway has at all times

14

denied these allegations and has been adamant that it has adequate consumer protection policies in place to prevent any such charges, including but not limited to, its "double opt-in" system. (Edelson Decl. ¶ 24.)

In addition to the evidentiary hurdles present in proving the above claims, these claims are untested and Media Breakaway has indicated that, absent a settlement, it was prepared to assert numerous legal challenges and defenses. (*Id.*) In Class Counsels' opinion, several of these challenges created legitimate risks to the litigation, most notably defenses based on *quantum meruit*, voluntary payment, and claims that the Class members were required to individually arbitrate these issues under carrier service agreements. (*Id.* at ¶ 25.)

Considering these obstacles, it is difficult to imagine a better result for the Class. Class members who submit claims or contact their wireless carriers or Media Breakaway by the deadline will receive ten (10) dollar cash refunds or their *pro rata* share of the Settlement Cap of $7.6 million if the number of claims, notice and administrative expenses, attorneys' fees and incentive awards, exceeds the amount of the Settlement Cap. The service improvements and assurances and compliance with the MMA guidelines provided under the settlement also substantially fulfill the lawsuit's purpose of stopping the phenomenon of charging for mobile content without authorization. Accordingly, Plaintiffs have alleged strong, but untested claims, which are subject to numerous potential defenses. As such, Plaintiffs' likelihood of success on the merits is uncertain and the value of the settlement is unquestionably strong in comparison.

**B.**    **Range of Possible Recovery and the Point on or Below the Range of Possible Recovery at Which the Settlement is Fair.**

The next two *Bennett* factors, the analysis of which are often combined, require the Court to determine "the range of possible recovery and the point on or below the range at which a settlement is fair, adequate and reasonable." *Lipuma*, 406 F. Supp. 2d at 1322. As in most

litigation, "[t]he range of potential recovery spans from a finding of non-liability through varying levels of injunctive relief, in addition to any monetary benefits to class members." *Figueroa*, 517 F. Supp. 2d at 1326 (citing *Lipuma*, 406 F. Supp. 2d at 1322) (internal quotation omitted). The potential recovery under consideration is the possible recovery at trial. *Lipuma*, 406 F. Supp. 2d at 1322. However, "the Court's role is not to engage in a claim-by-claim, dollar-by-dollar evaluation, but rather, to evaluate the proposed settlement in its totality." *Figueroa*, 517 F. Supp. 2d at 1326. "A settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery." *Behrens v. Wometco Enter. Inc.*, 118 F.R.D. 534, 542 (S.D. Fla. 1988).

In contrast to a settlement that provides fractional recovery, the present Settlement Agreement affords Class members $10 cash refunds up to the $7.6 million Settlement Cap. In the overwhelming number of cases, such a refund will make Class members whole.[3]   The negotiated $7.6 million Settlement Cap was determined by the following calculus:   (1) consideration of Media Breakaway's top-line and net revenues, (2) Class Counsels' investigation, consultation with experts and governmental agencies, and the results of confirmatory discovery, which led to the conclusion that, industry-wide, the average amount of unauthorized charges is approximately twenty percent; (3) Class Counsel then took this number and adjusted for the amount of refunds previously provided and the frequency and content of Media Breakaway-specific complaints and other information gathered as a result of its investigation and the negotiations process. (Edelson Decl. ¶ 7.) After conducting this analysis,

---

[3]     As discussed above, there is only one limitation to the $10 refunds afforded members of the Class: if the amount of claims filed by December 15, 2009, notice and administration expenses, attorneys' fees and incentive awards, exceeds the $7.6 million fund, Class members will receive their *pro rata* share of the Settlement Cap in lieu of the $10 refunds.

Class Counsel determined that $7.6 million roughly corresponded to the full amount of allegedly unauthorized charges properly attributable to Media Breakaway. (*Id.* at ¶ 18.)

In addition to the amounts paid through the formal claims process, to date, consumers have likely been refunded approximately $1,243,907.27, and half of those refunds may be applied towards the Settlement Cap. (Affidavit of Donald L. Frankenfeld, ¶ 10, a true and accurate copy of which is attached hereto as Exhibit C.); (Dkt. No. 56-1, p. 19, § VIII(3).) Taking those refunds into account, along with the monies to be paid through the claims process, notice and administration expenses, and the requested attorneys' fees and incentive awards, to date, just under $2.5 million of the $7.6 million Settlement Cap has already been exhausted. (Frankenfeld Aff. ¶ 10.) Moreover, the claims period lasts an additional three months through December 15, 2009 (Dkt. No. 79, p. 12), and close to $4 million is projected to be exhausted from the Settlement Cap separate and apart from the formal claims process. (Frankenfeld Aff. ¶ 13.)

In addition to the monetary relief secured on behalf of the Class, Class Counsel have secured profound injunctive relief to ensure that the phenomenon of billing for unauthorized mobile content is a thing of the past. Such injunctive relief "will result in [] profound financial savings to the class [] members, both now and into the foreseeable future, the value of which may perhaps exceed the value of the Settlement Cap." (*See* Declaration of Randall A. Snyder ¶ 12, a true and accurate copy of which is attached hereto D.)

Hence, the relief provided under the Settlement Agreement approaches the best that Plaintiffs could have hoped to achieve at trial. Although success at trial may have provided for additional relief, such as interest, the terms of the Settlement Agreement are in the upper range of what is fair, adequate, and reasonable.

### C.   The Complexity, Expense, and Duration of the Litigation.

The next *Bennett* factor the Court must consider is the complexity and expense of litigating this matter. 737 F.2d at 986. "The Court should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future after protracted and expensive litigation. In this respect, it has been held proper to take the bird in hand instead of a prospective flock in the bush." *Lipuma*, 406 F. Supp. 2d at 1323 (citing *In re Shell Oil Refinery*, 155 F.R.D. 552, 560 (E.D. La. 1993); *see also In re Domestic Air Transport*, 148 F.R.D. 297, 306 (N.D. Ga. 1993) (noting that with a settlement, the class members are ensured a benefit as opposed to the "mere possibility of recovery at some indefinite time in the future").

In the absence of the Settlement Agreement, it is certain that the expense, duration, and complexity of protracted litigation resulting from the claims asserted in the Plaintiffs' Second Amended Complaint would have been substantial. As noted above, significant costs would be incurred if this matter were to proceed to trial, including expenses for expert witnesses, technical consultants, and myriad other costs necessitated by the trial of a class action. Further, evidence and witnesses from across the country would have to be assembled and given the complexity of the issues and the amount in controversy, the defeated party would likely appeal. As such, the substantial relief provided to the Class under the Settlement Agreement weighs heavily in favor of its approval as compared to the inherent risk of continued litigation, trial, and appeal.

### D.   The Substance and Amount of Opposition to the Settlement

The Class members' reaction is an important factor in a court's determination of the fairness, adequacy, and reasonableness of the settlement. *Bennett*, 737 F.2d at 986; *Lipuma*, 406 F. Supp. 2d at 1324. The court may infer from the absence of objections that the majority of the

class found the settlement to be reasonable and fair. *Allapattah Serv., Inc. v. Exxon Corp.*, Case No. 91-0986-CIV, 2006 WL 1132371, *13 (S.D. Fla. April 7, 2006).

In this case, the court-approved notice procedures utilized by the Parties prompted no objections and no requests for exclusion, which weighs in favor of final approval of the settlement. (Rosenthal Decl. ¶¶ 16-17.); *see also Access Now, Inc.*, 2002 WL 1162422, *8 (granting final approval to class action settlement agreement where despite the comprehensive notice procedures employed, no objections to the settlement were filed); *Francisco v. Numismatic Guaranty Corp. of Am.*, Case No. 06-61677-CIV, 2008 WL 649124 at *5 (S.D. Fla. Jan. 31, 2008) (entering final approval of a class action settlement where no objections were filed and only two class members opted out). Moreover, while all relevant state and federal agencies received notice of the Settlement Agreement pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1715, not a single state or federal agency voiced any opposition to the terms of the Settlement Agreement. The lack of any opposition to the settlement militates in favor of its approval.

## E.    The Stage of Proceedings at which the Settlement Was Achieved

The final *Bennett* factor requires an evaluation of the stage of the litigation at which the settlement was achieved to ensure that Class Counsel had access to sufficient information concerning the merits of the case in order to properly analyze the benefits of settlement over continued litigation. *Lipuma*, 406 F. Supp. 2d at 1324 (citing *Behrens*, 118 F.R.D. at 544). Although courts favor early settlements, *Lipuma*, 406 F. Supp. 2d at 1324, the parties must have expended sufficient effort analyzing the issues at stake in the litigation. *Ass'n. for Disabled Ams, Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 470 (S.D. Fla. 2002).

In this case, the Settlement Agreement was finalized only after Class Counsel engaged in extensive investigation into Plaintiffs' claims and Defendant's potential defenses and only after the Parties aggressively litigated the case up until the class certification deadline. *See Lipuma*, 406 F. Supp. 2d at 1325 ("the proposed settlement was achieved early in the litigation, but not so early that Class Counsel did not have sufficient information to negotiate with"). Class Counsel were able to secure a favorable settlement as a result of the information exchanged with numerous governmental agencies, their lengthy investigation into Media Breakaway—which included gathering information from hundreds of aggrieved Media Breakaway consumers—and their knowledge of the industry gathered through similar lawsuits, as well as the information provided by Media Breakaway through discovery. The final factor of the *Bennett* test has been satisfied. Therefore, the Court should find the Settlement Agreement fair, reasonable, and adequate.

## V.   THE NOTICE PLAN DIRECTED TO THE CLASS COMPORTS WITH DUE PROCESS

The notice provided to Class members in this case certainly comports with the due process requirements of Fed. R. Civ. P. 23. Rule 23 requires that the class receive "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2). Notice to the class must be "reasonably calculated under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). Further,

> [t]he notice sent to class members must inform them whether claims like theirs were litigated in the earlier action. In addition, the class members' substantive claims must be adequately described and the notice must also contain information reasonably necessary to make a decision to remain a class member and be bound by the final judgment. In reviewing the class notice to determine whether it

satisfies these requirements, we look solely to the language of the notices and the manner of their distribution.

*Adams v. S. Farm Bureau Life Ins. Co.*, 493 F.3d 1276, 1285-86 (11th Cir. 2007) (internal citations and quotations omitted). All of these requirements were fully met by the notice procedures approved and directed by this Court in its June 15, 2009 Preliminary Approval Order, which Media Breakaway and the Claims Administrator followed.

As set forth in the Second Amended Complaint, Media Breakaway does not have a direct relationship with any of the wireless carriers who actually bill the consumer and have access to customer information—the *only* information Media Breakaway obtains in order to process transactions are the customers' cell phone numbers. (Dkt. No. 1, p. 5 ¶ 21.) In light of this fact, and notice issues that arise when only potential class members' cell phone numbers are known, the Parties retained Rosenthal and Company, a professional Claims Administrator who specializes in the administration and marketing of class actions. (*See* Declaration of Dan Rosenthal, ¶¶ 1-4, a true and accurate copy of which is attached as Exhibit E.) After being apprised of the nature of the mobile content industry, the claims asserted in the litigation, and the limited knowledge of the true identities of potential Class members, Rosenthal and Company developed a comprehensive notice plan specifically designed to reach as many members of the Class as possible.

The notification plan created by Rosenthal and Company and approved by this Court included: (1) a published notice in the major market newspaper in each of the top ten metropolitan statistical areas (based on total population); (2) publication nationally in *USA Today* and *Rolling Stone* magazine; (3) the erection of a settlement website; (4) targeted Internet advertising promoting website notice; (5) issuance of a joint press release, and (6) direct email notice to any potential members of the Settlement Class, including any customer who contacted

Media Breakaway about allegedly unauthorized mobile content. (Rosenthal Decl. ¶ 5.) Each aspect of the notice plan was specifically designed to reach as many potential Class members as possible.

Pursuant to this Court's Order, Media Breakaway published the "long form" notice on the Internet at www.mbclassaction.com on June 24, 2009. (Rosenthal Decl. ¶ 6.) The additional summary notices approved by this Court and disseminated in the manner described below, also directed the recipients to visit the website or to contact Rosenthal and Company or Class Counsel for complete settlement information. (Dkt. No. 56-2, p. 59.)

The broad publication notice to the Class consisted of running 1/8th page advertisements in the major publications and a 1/4 page ad in a popular national magazine. (Rosenthal Decl. ¶¶ 8-9.) The selected publications were: the *Miami Herald*, *New York Daily News*, the *Los Angeles Times*, the *Chicago Sun-Times*, the *Philadelphia Inquirer*, the *Houston Chronicle*, the *Dallas-Fort Worth Morning News Star Telegram*, the *Dallas Morning News*, the *Washington Post*, the *Atlanta Journal-Constitution*, the *Boston Globe*, *USA TODAY*, and *Rolling Stone* Magazine. (Rosenthal Decl. ¶ 9.) The newspapers in the top ten metro areas were chosen to add media weight to the base of national publications. (Rosenthal Decl. ¶ 10.) For the two national publications, USA Today was chosen as the national newspaper with the broadest consumer appeal, and Rolling Stone was selected as a magazine with broad appeal. (Rosenthal Decl. ¶¶ 9-10.) These publications have a combined total readership of 29.9 million adults, which is a reach of 14.9% of adults nationwide and in the top ten metro areas selected, the reach of all adults is even greater at 27.6%. (Rosenthal Decl. ¶ 10.) The approved summary notice was published in the major market newspapers and USA Today on July 2, 2009. (Rosenthal Decl. ¶ 9.) The summary notice was also published in the August 6, 2009 (which was on sale July 24, 2009)

issue of Rolling Stone. (Rosenthal Decl. ¶ 9.)

Subsequent to establishing the settlement website, Media Breakaway distributed a press release—the text of which was negotiated and agreed-upon by the Parties—via the Business Wire National Circuit on June 25, 2009. (Balabanian Decl. ¶ 14.) The press release included the web address of the settlement website. (*Id.*) Business Wire posts full-text news releases to major Internet portals, search engines, web sites, financial services and database systems. (Rosenthal Decl. ¶ 7.) Business Wire news is also carried by major syndicators and is posted to industry, newspaper and other targeted websites providing comprehensive direct reach to consumers, investors, media and other target audiences. (*Id.*) The average national distribution reaches approximately 25,000 destinations, which include Internet sites, trade publications, newspapers, broadcasting stations and wire services. (Rosenthal Decl. ¶ 7.) *See Greebel v. FTP Software, Inc.*, 939 F. Supp. 57, 62 -63 (D. Mass. 1996) (finding a press release distributed on the Business Wire satisfied the PSLRA, 15 U.S.C. § 78 *et seq.*'s requirement that "widely circulated" publication be given to the class). Some of the outlets to publish the press release included: Reuters, Forbes, Mobile Marketer, Euroinvestor, and Business Exchange. (Balabanian Decl. ¶ 14.)

In addition to the coverage generated by the press release, Rosenthal and Company's notice plan also included targeted internet advertising promoting the settlement web site. Media Breakaway purchased Internet advertising to promote the Settlement Website. (Rosenthal Decl. ¶ 12.) There are two primary methods of purchasing Internet advertising: "Key Word Searches" and "Content Campaigns." (*Id.* at ¶ 12.) Key Word Searches require Internet users to type in "key words" and "key phrases" when conducting an Internet search. (*Id.*) The searches result in lists of links to websites. (*Id.*) The drawback of this process is that significant advertising is

needed to prime Internet users to search the Internet using the key words related to the settlement. (*Id.*) This is especially true when the Defendant brand is relatively unknown. (*Id.*) A Content Campaign, on the other hand, uses agreed-upon key words and phrases to determine the sites on which text and banner ads will be placed by Google, Yahoo! and other search engines. (*Id.*) Content Campaigns place links (the text and banner ads) on websites that have content related to the categories specified by the advertiser. (*Id.*) Rosenthal and DANART have researched the effectiveness of these two methods of Internet advertising and have concluded that the Content Campaign methodology is significantly more effective in generating gross impressions and Settlement Website traffic, particularly with respect to settlements related to cell phone content downloads. (*Id.*) Therefore, a Content Campaign was used for the Media Breakaway settlement Internet advertising. (*Id.*) As of September 9, 2009, the Internet advertising has generated 8,545,442 impressions.[4] (*Id.* at ¶ 13.)

In addition to the publication notice, targeted Internet advertising, and press release, on August 12, 2009, an email notification substantially in the form of the long form notice was sent to approximately 127,059 email addresses. (*Id.* at ¶ 11.) Of these emails, 50,613 were undeliverable, netting 76,446 emails delivered to Media Breakaway's customers. (*Id.*) The reach of the emails delivered to Media Breakaway customers combined with the published notices is approximately 30.1% in the top ten metro areas and approximately 12.3% in the remainder of the country. (*Id.*) Although not tracked, the articles that resulted from the press release and the impressions delivered by the Internet advertising conservatively adds another 5% to 10% or more reach to each of these figures. (*Id.* at ¶ 15.)

---

[4] An impression is the number of times an ad is displayed on Google or on sites or products in the Google Network, sometimes considered the number of times someone "saw" the ad. (Rosenthal Decl. ¶ 9.)

In conclusion, the notice plan utilized in this matter comports with Rule 23, due process, and is more substantial than similar plans used in analogous class action settlements. *See, e.g., In re Sony SXRD Rear Projection Television Class Action Litig.,* No. 06 Civ. 5173, 2008 WL 1956267, at *4 (S.D.N.Y. May 1, 2008) (granting final approval of class action settlement with estimated 172,000-175,000 members and where notice was provided directly to approximately 40% of class as contained in defendant's records and was supported by publication and a settlement website). As the comprehensive notice plan comports with due process, the settlement is deserving of final approval.

## VI.   THE ATTORNEYS' FEES AND EXPENSES DETERMINED BY THE ARBITRATION SHOULD BE APPROVED BY THE COURT

As in any class action, the amount of attorneys' fees and expense reimbursement to be paid to Class Counsel are subject to Court approval. *See Hensley v. Eckerhart,* 461 U.S. 424, 437 (1983). The parties can agree to such numbers or agree to a procedure to have the numbers determined, but it is always ultimately up to the Court whether to approve such payments.

Under the terms of the Settlement Agreement, the parties were required to mediate the Fee Award, and if mediation proved unsuccessful, the Parties were required to submit the matter to binding arbitration. (Dkt. No. 56-1, p. 26, § XIII.) (The Arbitration Award is binding on both Parties and not appealable, but as noted above, remains subject to the approval of this Court.)

As noted above, the Parties attempted in good faith to mediate the issue, but the mediation proved unsuccessful. (Balabanian Decl. ¶ 9.) This issue was therefore referred to binding arbitration which took place on July 8, 2009, followed by extensive briefing by the Parties. (*Id.* at ¶¶ 10-11.) Following oral argument and briefing, including Media Breakaway's Motion to Reconsider the Arbitration Award of August 3, 2009, the Arbitrator awarded Class Counsel $1,520,000.00 in total attorneys' fees and $34,034.07 in costs. (Dkt. No. 95.) Such

Award, however, remains subject to the approval of the Court. As shown below, this award is eminently fair and reasonable and, under controlling Eleventh Circuit authority, is on the low end of fees typically awarded in this Circuit.

### 1. The Requested Fees Were Negotiated and Agreed to Only After an Agreement was Reached with Respect to Class Relief.

Courts strongly encourage negotiated fee awards in class action settlements. *See Hensley*, 461 U.S. at 437 ("A request for attorneys' fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of the fee."); *accord Cohn v. Nelson*, 375 F. Supp. 2d 844 (E.D. Mo. 2005) ("where, as here, the parties have agreed on the amount of attorneys' fees and expenses, courts give the parties' agreement substantial deference"). Courts have recognized the benefits these agreements provide in that they assure defendants of their maximum exposure and shield the plaintiffs from being "sandbagged," especially where the settlement was free of collusion. *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1293, n. 4 (11th Cir. 1999) (quoting *Malchman v. Davis*, 761 F.2d 893 (2d Cir. 1985).) Here, the parties mediated and then arbitrated the requested amount of attorneys' fees and only after the Parties reached agreement with respect to Class relief. This eliminates any potential issues regarding conflicts of interest and gives the resulting negotiated fee the insignia of legitimacy.

### 2. Class Counsel are Entitled to a Percentage of the Value of the Settlement.

In a settlement such as this, class counsel "are entitled to compensation for their services from the common fund," with the amount being subject, of course, to court approval. *Camden I Condominium Ass'n v. Dunkle*, 946 F.2d 768, 771 (11th Cir. 1991); *Francisco v. Numismatic Guaranty Corp. of America*, 2008 WL 649124 (S.D. Fla. Jan. 21, 2008); *In re Sunbeam*, 176 F. Supp. 2d 1323, 1333 (S.D. Fla. Nov. 29, 2001); *see also Waters*, 190 F.3d at 1292 (applying a percentage-of-the-fund approach in claims made settlement with a reversionary right to

defendant of unclaimed funds). This rule is rooted in the premise that those who receive the benefits of a settlement or judgment are unjustly enriched by the time, effort and energy expended by the successful litigant and attorneys. *Camden I*, 946 F.2d at 771; *Mills v. Elec. Auto-Lite, Co.*, 396 U.S. 375, 392 (1970). Further, this doctrine recognizes both the need to encourage lawyers to pursue cases aimed at redressing wrongs inflicted upon entire classes of people and discourages future misconduct by defendants and others. *Mashburn v. Nat'l Healthcare, Inc.*, 684 F. Supp. 679, 687 (M.D. Ala. 1988); *see Deposit Guaranty Nat'l Bank v. Rope*; 445 U.S. 326, 338-39 (1980).

The Eleventh Circuit set the standard in *Camden I*, where it held that "henceforth in this circuit, attorney's fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class." 946 F.2d at 774; *see also Allapattah*, 454 F. Supp. 2d 1185, 1201 (S.D. Fla. 2006). The analysis is relatively straightforward: whether a proposed fee represents a reasonable percentage of the class benefit requires weighing the twelve "*Johnson* factors," *Camden I*, 946 F.2d at 774 (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)), which allow a court, based on the circumstances of the case, to determine the reasonableness of the request. As demonstrated in Subsection 4 below, applying the *Johnson* factors here shows that the fee requested is reasonable to the Class and the Parties.

### 3.     The Requested Fees Represent Approximately 20% of the Cash Relief Made Available to the Class.

In considering the percentage of the common fund, a court should first look at the amount of the fees requested in relation to the total settlement benefits conferred, regardless of whether those benefits are actually claimed. *See, e.g., Boeing*, 444 U.S. at 480 81; 2 Newberg on Class Actions § 1.18 (3d ed.1992) ("[I]t is now settled that class counsel may seek a fee award based

27

on the total potential benefit to the class, rather than being limited by the total amount of claims actually exercised by class members."); *accord Stahl v. Mastec, Inc., et. al.,* No. 8:05-CV-1265-T-27TGW, 2008 WL 2267469, \*1 (M.D. Fla., May 20, 2008) (citing *Boeing* and *Waters* for the proposition that "it is appropriate that the attorneys' fees be awarded on the entire Maximum Gross Settlement Amount even though amounts to be paid to settlement class members who do not file a claim form will remain the sole and exclusive property of the defendant").

The total settlement benefits here include not only the $7.6 million in monetary benefits, but also the non-monetary relief as well. *Hall v. Cole,* 412 U.S. 1, 5 n. 7 (1973) (noting the common fund doctrine "must logically extend, not only to litigation that confers a monetary benefit on others but also litigation 'which corrects or prevents an abuse which would be prejudicial to the rights and interests of those others'") (quoting *Mills,* 396 U.S. at 396); *see also Camden I,* 946 F.2d at 775. In a sense then, "common fund" is somewhat of a misnomer in that the full benefit to the class is to be considered. *Elkins,* 1998 WL 133741, at \*32 (finding the court includes non-monetary benefits in valuing a common fund).

In addition to the monetary relief secured on behalf of the class, Class Counsel have secured profound injunctive relief to ensure that the phenomenon of billing for unauthorized mobile content is a thing of the past. (*See* Exhibit D.) Thus, while the monetary component is no doubt significant, the prospective relief is also profound and must be considered when calculating the proper amount of attorneys' fees to be paid to Class Counsel. Indeed, as Media Breakaway's counsel pointed out at the preliminary approval hearing:

> A lot of times the monetary component of a settlement gets all of the attention and all of the press, but what's really significant about this settlement is the change in practices that's been accomplished. My client is a member of a brand new industry and in the beginning of that industry there were a lot of growing pains ... The Attorneys General in several states have gotten involved, we've agreed to adhere to what are known as the Mobile Marketing Association's best

practices going forward, and these are a set of guidelines that have been developed I believe with the input of Attorneys General around the country, as well as consumer advocates and members of the industry. My client has agreed to make that part of the settlement. Your Honor would have continuing jurisdiction if somebody were to come back and say they're not doing that. And frankly, it's hard to put a value on something like that going forward, but it is definitely a value that these people before the Court now in this class will enjoy, as well as all future customers of my client. And I just want that to be part of the calculus here.

(Dkt. No. 91-11, Ex. B, 3/27/09 Hrg. Tr. at 11.)

Although Class Counsel have not sought to place any monetary value on the injunctive relief, such relief "represents a real benefit to consumers" (*See* Declaration of David Buckner, ¶ 13, a true and accurate copy of which is attached as Exhibit F), and it therefore should be considered in valuing the settlement and calculating the Fee Award. *See e.g., Elkins*, 1998 WL 133741, at *32 (finding that the court includes non-monetary benefits in valuing a common fund); *Sheppard v. Consol. Edison Co.*, Case No. 04-CV-0403 (JG), 2002 WL 2003206, at *7 (E.D. N.Y. Aug. 1, 2002) (in valuing total settlement for percentage based attorneys' fee award, court included $6.745 million in monetary relief and "an estimated $5 million in non-monetary, injunctive relief"); *Steiner v. Williams*, Case No. 99 CIV. 10186 (JSM), 99 CIV. 1479 (JSM), 2001 WL 604035, at *4 (S.D.N.Y. May 31, 2001) ("Although the settlement in this action did not involve the payment of money by the defendants, counsel may nonetheless recover a fee if the settlement conferred a substantial non-monetary benefit.").

Thus, when valuing the settlement benefits to the Class, the $7.6 million cash component should be viewed as the starting point. The agreed-upon fees therefore represent 20% of the lowest value of the settlement. As shown below, this percentage is reasonable in light of the *Johnson* factors.

4.    **A Fee Reflecting 20% of the Benefit Provided to the Class is More than Reasonable in Light of the *Johnson* Factors.**

The twelve *Johnson* factors, analyzed in turn, are: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Camden I*, 946 F.2d at 772 n. 3. Each shows that the percentage requested is reasonable.

A.    **The time and labor required supports the requested attorneys fees.**

Class Counsels' lodestar through September 9, 2009, the date of submission of this brief, is $726,629.74. (Edelson Decl. ¶ 28.) This amount reflects time a team of lawyers spent researching, filing, litigating, negotiating and ultimately settling this matter against a well-financed corporation that employed lawyers highly experienced in class action litigation. (Edelson Decl. ¶ 29.) Class Counsels' lodestar is reasonable because their rates reflect market rates, and class actions of this sort require a significant investment of time. (Buckner Decl. ¶ 10.) As Class Counsels' fee expert explained:

> Plaintiffs' consumer class actions are very difficult to effectively prosecute. They require significant investigation of the factual parameters of the claim prior to filing the complaint so that counsel is able to allege sustainable causes of action that have the potential to be certified for class treatment. That investigation requires research into the industry and its practices, identification of responsible parties, development of legal theories, and preparation of clients for their roles as class representatives. From the plaintiff's perspective, one of the easiest ways to lose a class action is to fail to adequately investigate the proposed class' claims and possible remedies, and such investigation requires a large investment of time before the first pleading is ever filed.

(Buckner Decl. ¶ 10.)  Class Counsel also incurred expenses, through September 9, 2009, of $47,615.07, of which only $34,034.07, were awarded by the Arbitrator.  (Edelson Decl. ¶ 33.); (Award of Arbitrator ¶ III(E).)  Given the time spent on the case, the percentage requested reflects a multiplier of slightly over 2, which is certainly reasonable in this jurisdiction.  *See Behrens*, 118 F.R.D. at 549, *aff'd*, 899 F.2d 21 (11th Cir. 1990) (recognizing appropriate lodestar multipliers between 3 and 4); *Di Giacomo v. Plains All Am. Pipeline*, Case No. CIV. A.H.-99-4137, CIV. A.H.-99-4212, 2001 WL 34633373, *10 (S.D. Fla. Dec. 19, 2001) (awarding a multiplier of 5.3).  Significantly, the Arbitrator found the time and labor expended by Class Counsel in this matter to be reasonable.  (Dkt. Nos. 82 and 95.)  Thus, there should be little question that this amount[5] is more than reasonable, especially in light of the well-settled precedent in this Circuit that "[t]he majority of common fund awards fall between 20% and 30% of the fund."  *Camden I*, 946 F.2d at 774 (citing Newberg, *supra* § 2.08 at 51).

Although Class Counsel sought more than the requested fee at the arbitration, abiding by the terms of the Settlement Agreement, Class Counsel have not, and will not, seek to disturb the Arbitration Award. The Court should decline to do so as well.

**B.      The novelty and difficulty of the questions involved supports the fee request.**

As far as consumer class actions are concerned, unauthorized mobile content cases are rather complex. Without in any way understating other types of litigation, each of which present diligent practitioners with unique challenges, demands for thoroughness, and opportunities for creativity, Class Counsel faced no easy task here. (Buckner Decl. ¶ 10.)  Class Counsel were

---

[5]      The Arbitrator's Award also does not take into account additional time in the amount of $39,340.00, and expenses in the amount of $3,200.00, incurred in preparation for, during, and after the arbitration of July 8, 2009, which included responding to Media Breakaway's Motion to Reconsider, preparing for the Final Approval hearing and responding to Class Member inquiries, as well as the time that will inevitably be spent assisting with settlement administration should the Court grant final approval. (Edelson Decl. ¶¶ 28, 30.)

required to build in depth knowledge of a young industry experiencing rapid growth, including performing research into the programming and technology behind mobile content and cellular telephones, the relationships between the key players that bring premium mobile content from the development stages to the end customers, the billing systems and profit-sharing arrangements these companies employ, the methodologies used to bill for unauthorized mobile content, and the industry standards and efforts to combat unauthorized mobile content billing.

Moreover, Class Counsel had to contend with procedural difficulties, including crafting a settlement that adequately addresses the problems of unauthorized mobile content, compensates class members financially, and pays due respect for a new industry's need for flexibility. All in all, this litigation was sufficiently novel and difficult to support the fees requested.

**C.      Class Counsel demonstrated the skill requisite to perform the legal service properly**

In addition to the research and investigation described above, Class Counsel are experienced in this type of litigation, having focused much of their practice on consumer protection class actions generally, and third party mobile content charges in particular. (Edelson Decl. ¶ 22.); (Buckner Decl. ¶ 12.) Class Counsel were the first to reach a cramming settlement with a billing aggregator known as Mobile Messenger in the case captioned *Gray v. Mobile Messenger Americas, Inc.*, No. 08-cv-61089 (S.D. Fla. Dec. 1, 2008). (Edelson Decl. ¶ 22.) *Gray* received final approval on December 1, 2008 by District Judge Cecilia M. Altonaga. (Edelson Decl. ¶ 22.) In addition to the *Gray* settlement, Class Counsel have also reached the nation's first and only cramming settlement with a wireless carrier in the case of *McFerren v. AT&T Mobility, LLC*, No. 2008-CV-151322, (Fulton County, Georgia). (Edelson Decl. ¶ 22.) While the settlement structure established here is largely based upon the settlements reached in *Gray* and *McFerren*, the instant settlement is the first of its kind against a mobile content

provider/operator of an affiliate marketing network. (*Id.*) This presented added difficulties in that no well-tested model existed from which to base the settlement's framework. (*Id.*) This factor weighs in favor of finding the requested fee reasonable.

**D.      The preclusion of other employment by Class Counsel due to acceptance of this case supports the fees requested.**

Due to the substantial time devoted to this case, and others that assisted in reaching the instant settlement by KamberEdelson LLC, the attorneys were unable to accept several other cases. (*Id.* at ¶ 26.) Therefore, this factor also weighs in favor of the fees sought by Class Counsel.

**E.      The fees requested are less than those customarily awarded in similar cases.**

Class Counsels' rates are comparable to or less than those typically paid to both defense counsel and plaintiffs' firms in similar types of sophisticated cases. (*Id.* at ¶ 31.); (Buckner Decl. ¶ 8.) Indeed, a federal task force, commissioned by the Third Circuit,[6] studied the court-awarded attorneys' fees across the country and found that in class action cases, "judges systematically awarded fees in the range of twenty to twenty-five percent of the fund...." *Court Awarded Attorney Fees*, Report of the Third Circuit Task Force, 108 F.R.D.237, 247 (1985) ("the Task Force Report"). Moreover, the Eleventh Circuit in *Camden I* observed that "the majority of common fund fee awards fall between 20% to 30% of the fund" and "district courts are beginning to view the median of this 20% to 30% range, i.e. 25%, as a 'bench mark' percentage fee award...." *Id.* Therefore, the requested fee amount (20% of the Settlement Cap) is not only less than the "bench mark" amount awarded in this Circuit, but is also less than the standard fee amount found in the marketplace for nationwide class actions of this nature. *See* Newberg, *supra*

---

[6]      Importantly, this Circuit has adopted the Task Force Report. *See Camden I*, 946 F.2d at 774-75.

§ 2.08 at 51 (stating that even fees over 50% of the funds available to class have been awarded in some cases).

Moreover, Class Counsels' lodestar here would result in a lower fee than a private individual contingency fee agreement, where the attorney would likely receive 30%-40% of the value of the recovery, including any injunctive relief. *See, e.g. Blum v. Stenson*, 465 U.S. 886, 904 (1984); *Kirchoff v. Flynn*, 786 F.2d 323, 325 n. 5 (7th Cir. 1986). Furthermore, had the decision for fees been left to this Court to decide, Class Counsel would have been within their right to justify a reasonable fee totaling 25-30% of the settlement benefits—equaling as much as $2.28 million—as opposed to the $1,520,000.00 requested.

**F.      The contingent nature of the requested fee and the circumstances surrounding the settlement support the conclusion that the request is reasonable**

The fact that the fees sought are contingent in this case weighs in favor of approving the requested fee award. *See Behrens*, 118 F.R.D. at 541; *see also In re Sunbeam*, 176 F. Supp. 2d at 1335 ("A contingency fee arrangement often justifies an increase in the award of attorneys' fees"). The award's contingent nature provided an incentive for Class Counsel to litigate efficiently. This approach promotes the goal of deterring excessive and duplicative expenditure of resources, which is present in all class actions. *See* Hailyn Chen, *Attorneys' Fees and Reversionary Fund Settlements in Small Claims Consumer Class Actions*, 50 U.C.L.A. L. REV. 879, 892 (2003) ("Limiting class counsel to a fee based on a percentage of what class members actually claim will, in many instances, result in a fee that is so small as to prevent class action attorneys from pursuing such cases...."); 7b Wright, Miller, & Kane, *Federal Practice & Procedure*, § 1803.1 at 369 (3d ed. 2005) ("If counsel did not have the prospect of an award that

took account of the risks and uncertainties, the necessary incentive would be lacking and a major weapon for enforcing various public policies would be blunted.").

Additionally, as explained above, the contingent nature of the fees presented increased risks given that no other law firm had ever reached a settlement with a mobile content provider/operator of an affiliate network for unauthorized mobile content. All of these factors further support the reasonableness of the requested fees.

**G.      The fee request is reasonable in light of the amount involved and the results obtained.**

As set forth above, the present request for attorneys' fees is entirely reasonable in light of the benefits provided to the class under the Settlement Agreement. Indeed, "[t]he settlement with Media Breakaway is an excellent result for the proposed class ... it is a testament to the skill of Plaintiffs' counsel that they have been able to achieve the favorable resolution now before the Court." (Buckner Decl. ¶ 14.) Accordingly, the requested fee percentage is reasonable.

**H.      The experience, reputation and ability of the attorneys suggest the fee is reasonable.**

The time spent and the rates sought by Class Counsel are commensurate with the practice, skills and experience of the particular attorneys who performed the work. (Edelson Decl. ¶ 31.) Class Counsel are dedicated to consumer class action cases, especially those involving new technologies, and they have been the first to structure settlement agreements for cramming cases against wireless carriers, aggregators, and now content providers/operators of an affiliate network. (*Id.* at ¶ 22.) In addition, Class Counsel have emerged as one of the leading class action law firms in the country. (Edelson Decl. Ex. 1.) Class Counsel have led the way in class action litigation against the mobile content industry, and they have undertaken numerous high-profile cases, including the AT&T mobile content litigation and settlement. (*Id.*) Class

Counsel have also been appointed to lead roles in a number of other class action suits, including the 2007 contaminated pet food recall, the Thomas the Tank Engine lead paint class actions, and the Sony CD technology multi-district litigation. (*Id.*)  In recognition of their breadth of knowledge and experience, Class Counsel have testified before the United States Senate on class action issues, and they have repeatedly been asked to work on federal and state legislation involving cellular telephony and other issues. (*Id.*)

I.    **The "undesirability" of the case.**

Defendants such as Media Breakaway are sophisticated and, given the relative youth of the mobile content industry, were prepared to vigorously defend the claims asserted here. Putting aside the difficulties inherent in any class action litigation, victory in this case was not certain in the slightest.  Media Breakaway had strong class related arguments as well as myriad carrier-customer arbitration agreements that it could have sought to enforce at its disposal. Accordingly, Class Counsel took a relatively tremendous risk in their effort to give Plaintiffs their "day in court" and this factor also weighs in favor of approving the requested fees.

J.    **The nature and length of the professional relationship with the client does not militate in favor or against the requested fees.**

This factor does not weigh in favor or against the requested fee. Plaintiffs VanDyke and Ben Walker are two of thousands of cell phone users who have contacted KamberEdelson to complain about unauthorized mobile content.  The settlement provides Plaintiffs with a fair incentive award (described below), but the nature of the professional relationship does not inform the fee discussion here as greatly as it may in other cases.

**K.** **Awards in similar cases suggest the fees requested here are on the low end of what is typically considered reasonable.**

As shown above, similar cases award class counsel attorneys' fees in the range of 25% to 30% of the total settlement benefit. *Camden I*, 946 F.2d at 774-75. However, when all is said and done, Class Counsels' duty is to the class members. Class Counsel have thus resisted the temptation often present in class action settlements to allow greed to triumph over sound Class benefits by seeking an unreasonably high Fee Award. Since a neutral Arbitrator decided the Fee Award, it should be viewed as reasonable under all the circumstances described above and, as a result, should be approved by the Court.

## VII. THIS COURT SHOULD APPROVE THE AGREED-UPON INCENTIVE AWARD TO CLASS REPRESENTATIVE AND NAMED PLAINTIFFS

Under the Settlement Agreement preliminary approved by this Court, the Class Representative Ben Walker and the other two named Plaintiffs in this case and the Related Action, Denee VanDyke and Ronald Ayers, are to receive a collective incentive award of $6,000, subject, of course, to this Court's final approval.

Courts have found it appropriate to award named class Plaintiffs for the benefits they have conferred upon the Class. *See Allapattah*, 454 F. Supp 2d at 1218-19; *In re Dun & Bradstreet Credit Servs. Customer Litig.*, 130 F.R.D. 366 (S.D. Ohio 1990) (awarding two incentive awards of $55,000, and three incentive awards of $35,000); *Bogosian v. Gulf Oil Corp.*, 621 F. Supp. 27 (E.D. Pa 1985) (awarding incentive awards of $20,000 to each of two Plaintiffs). As explained in *Allapattah*:

> While the Eleventh Circuit has not set forth guidelines for courts to use in determining incentive awards, there is ample precedent for awarding incentive compensation to class representatives at the conclusion of a successful class action. In fact, 'courts routinely approve incentive awards to compensate named Plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation.'

454 F. Supp. 2d at 1218-19 (quoting *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 694 (N.D. Ga 2001)).

In this case, the incentive award, which has been agreed upon by the Parties and fully disclosed to the Class, is entirely reasonable and well within the range of similar awards. Not surprisingly, there have been no objections to it, nor should there be. Here, the Class Representative and named-plaintiffs' involvement in this case and the Related Action were critical to the ultimate success of this case. These individuals were prepared to have their depositions taken, and each worked closely with Class Counsel to investigate their claims. (Edelson Decl. ¶ 34.) In light of the sacrifices that these individuals made for the benefit of the Class, the agreed-upon incentive award is more than reasonable and should be given final approval.

## VIII.  CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court enter an Order (1) granting final approval of the Stipulation of Class Action Settlement between Plaintiffs and Defendant Media Breakaway, LLC, (2) dismissing the Second Amended Complaint against Media Breakaway with prejudice and releasing Media Breakaway of any and all liability as provided in the Stipulation of Settlement, (3) awarding Class Counsel reasonable attorneys' fees in the amount of $1,520,000.00, and costs in the amount of $34,034.07, (4) awarding an incentive payment to Class Representative Ben Walker and named-plaintiffs Denee VanDyke and Ronald Ayers, and (5) granting such other and further relief as this Court deems equitable and just.

Dated: September 9, 2009          Respectfully submitted,

**DENEE VANDYKE** and **BEN WALKER**,
individually and on behalf of all others similarly situated,

By: /s/ David P. Healy
David P. Healy (0940410)
2846-B Remington Green Cr.
Tallahassee, FL 32308

CLASS COUNSEL:
Jay Edelson (*Admitted Pro Hac Vice*)
Myles McGuire (*Admitted Pro Hac Vice*)
Rafey Balabanian (*Admitted Pro Hac Vice*)
KAMBEREDELSON, LLC
350 North LaSalle, Suite 1300
Chicago, IL 60654
T: 312.589.6370
F: 312.589.6378

39

## CERTIFICATE OF SERVICE

I, David P. Healy, an attorney, certify that on September 9, 2009, I served the above and foregoing *Motion and Memorandum in Support of Final Approval of Class Action Settlement and Petition for Approval of Attorneys' Fees and Plaintiffs' Incentive Award*, by causing true and accurate copies of such paper to be filed and transmitted to the persons shown below via the Court's CM/ECF electronic filing system, on this the 9th day of September, 2009.

Frank Zacherl, Esq.
Shutts & Bowen, LLP
1500 Miami Center
201 South Biscayne Blvd.
Miami, FL 33131
t. 305.358.6300
f. 305.381.9982
*Attorney for Media Breakaway, LLC*

/s/ David P. Healy

40